1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT

8          DISTRICT OF NEVADA

9                    * * *

10  UNITED STATES OF AMERICA,        )
                                     )
11                                   )
              Plaintiff,             )        2:03-CR-00534-PMP-(RJJ)
12                                   )
                                     )        REPORT &  RECOMMENDATION
13  vs.                              )           OF UNITED STATES
                                     )          MAGISTRATE JUDGE
14                                   )        (Defendant's Motion to Suppress (#56))
    MICHAEL A. CERNAK,               )
15                                   )
                                     )
16            Defendant.             )
    _____)
17

18          This matter came before the Court for a hearing on Defendant Michael A. Cernak's Motion

19  to Suppress (#56).  The Court has considered the Motion (#56), the Government's Response (#59),

20  the Defendant's Reply (#61), as well as the  testimony and evidence presented at the evidentiary

    hearing.
21

22                          **FACTUAL BACKGROUND**

23          On the afternoon of November 10, 2003, the Wells Fargo Bank at 10850 West Charleston

24  Blvd., Las Vegas, Nevada, was robbed. The description of the bank robber and details regarding the

25  robbery were similar to five previous bank robberies in the community. Based on information

26  previously received from a citizen informant, as well as the details regarding this robbery, four FBI

27  agents went to the residence of Defendant, Michael A. Cernak, at 3633 Lake Shore Court

28  immediately after notice of the robbery.

At approximately 3:20 P.M. that afternoon, Cernak drove his green Maxima with New Mexico license plates into his driveway on Lake Shore Court, a cul-de-sac. Immediately, the FBI agents followed Cernak and parked their vehicles on each side of his. Upon seeing them, Cernak reversed his vehicle and backed out of the driveway and into the street. Special Agent Wenko, immediately positioned himself in front of Cernak's vehicle. Agent Wenko pointed his rifle, a MP5 at the defendant. The other FBI agents positioned the two vehicles to block Cernak's exit and then all held guns on Cernak as he sat in his vehicle with the engine running. Agents Wenko and Beasley yelled commands to Cernak as he sat in the vehicle. He was ordered to turn off the car ignition, he did not. He was ordered to put his hands up, which after some delay, he did. He was ordered to get out of the car, but did not comply. Finally, Agent Wenko opened the door of the car and pulled Cernak out. A struggle ensued as Cernak tried to flee. Cernak head-butted one agent causing a cut on his face. A police scanner  fell from Cernak during the struggle. After he was placed on the ground and handcuffed, the four agents put their weapons away and walked Cernak toward the vehicles. Again, Cernak tried to flee, and was taken to the ground by the agents. Shackles were then place on his ankles. At this point, Cernak began crying. The agents testified that his conduct is not unusual based on their experience in other arrests.

Before being transported from the scene, Cernak was allowed to speak with his girlfriend through the window of the police vehicle he was seated in. No Miranda rights were given at the scene. No interrogation took place at the scene.

Agents Beasley and Green transported Cernak to the FBI office. During the twenty minute trip, Cernak said that he was going to prison for a long time. Agent Beasley's response was that Cernak could not talk about the robbery at that time. A conversation ensued about Cernak's care and breeding of dogs. He indicated that he currently had twelve chihuahuas. Agent Beasley testified that Cernak was calm and that there was no odor of alcohol in the car.

At the FBI office, Cernak was taken to the third floor interview room where he was handcuffed by his non-writing hand to the desk. Asked whether he was thirsty, hungry or needed to use the restroom, Cernak answered that he was thirsty and hungry. A Coke and cookies were

1   provided and Cernak consumed them. Special Agent Green conducted the interview. She read out

2   loud the Miranda Waiver Form (Exhibit 1). Cernak appeared to read it also and then signed it. Agent

3   Green during the course of the interview asked Cernak if he would consent to a search of his

4   residence and vehicle. He agreed and Agent Green reviewed and read the Search Permission Form

5   (Exhibit 3) which Cernak then appeared to read and sign. Finally, Cernak was asked if he would like

6   to write a letter of apology to the victims at the bank. He agreed with this idea and hand wrote a three

7   page letter. (Exhibit 5). The entire interview at the FBI office lasted approximately sixty to seventy-

8   five minutes and is memorialized in the 302 Report (Exhibit 2) prepared by Agent Green.

9        Agent Beasley and Agent Green testified that the interview was conducted in conversational

10  tones and that Cernak appeared to understand and appropriately answer all questions. No guns were

11  displayed by the agents during the interview. No threats were made by the agents during the

12  interview. The defendant did not appear to be under the influence of alcohol or drugs during the

13  interview. In regard to the consent to search, no reference or threat of a search warrant was made to

14  Cernak by the agents. Agent Green noted that Cernak demonstrated very accurate recall regarding

15  the robbery that day, as well as the five previous bank robberies. She also noted that he responded

16  with greater detail than she expected. When photographs and notes from the robbery on November

17  10, 2003, and previous robberies were presented to Cernak, he identified himself, and his

18  handwriting and made an appropriate notation on each item during the interview. The agents also

19  testified that no promises or guarantees were given as incentives for Cernak's cooperation during the

20  interrogation.

21       According to Agent Beasley, Cernak told them that he had purchased and consumed a

22  twenty-four ounce beer earlier that day before the robbery. However, after drinking the beer, he took

23  a nap and then used the treadmill for awhile before going to the Wells Fargo Bank. Cernak also told

24  them that he used no drugs that day. Cernak waived his rights and testified at the hearing. He

25  confirmed the single beer that he had that day, but did tell a story of using controlled substances,

26  including LSD, marijuana and "huffing" on paint the night before. He also stated that he did stop

27  crying before the interview. At the end of the interview, Agents Purcell and Wenko arrived at the

28

1   FBI office. Cernak apologized to Agent Purcell for the injury he caused. Testimony was provided

2   during the hearing regarding Cernak's mental condition and general competency. Dr. Jasmine

3   Tehrani, a clinical psychologist with Los Angeles County, and a contract employee with the Federal

4   Bureau of Prisons, testified regarding a previous evaluation of Cernak. Dr. Tehrani's evaluation

5   concluded that Cernak had a psychotic disorder not specified and polysubstance dependence. Further,

6   based upon testing and evaluation, Dr. Tehrani concluded that Cernak was in the mild mental

7   retardation to borderline range of intellectual functioning with an IQ of 61 (Defendant's Exhibit B).

8   However, Dr. Tehrani also noted that some evidence of potential malingering was present in the

9   testing and evaluations of Cernak. Finally, and most significant, Dr. Tehrani testified that Cernak's

10  mental competency would not prohibit a valid waiver of rights. Further, Cernak's psychological

11  condition does not undermine a waiver of rights. In fact, Dr. Tehrani was unable to offer any opinion

12  whether the defendant voluntarily waived his <u>Miranda</u> rights and consented to the search of his

13  residence and vehicle. Dr. Tehrani suggested, consistent with the law that the observations of the

14  arresting and interviewing officers would be more valuable in assessing Cernak's ability to

15  understand and waive his rights.

16          Defendant, Michael A. Cernak, has been charged in this case with multiple bank robberies.

17  Cernak brings this motion to suppress any evidence that was obtained as a result of the November

18  10, 2003, interrogation because he did not voluntarily, knowingly and intelligently waive his right

19  to remain silent. Further, he argues that the agents knowingly took advantage of his diminished

20  mental capacity. The facts are contrary to Cernak's argument.

21                                          **DISCUSSION**

22          "A heavy burden rests on the government to demonstrate that the defendant knowingly

23  and intelligently waived his privilege against self-incrimination and his right to retained or

24  appoint counsel." <u>Miranda v. Arizona</u>, 384 U.S. 436, 475 (1966); see also <u>Colorado v. Connelly</u>,

25  479 U.S. 157, 165 (1986).  The government is required to meet this burden by establishing by a

26  preponderance of the evidence that a defendant waived his <u>Miranda</u> rights.  <u>Colorado v.</u>

27  <u>Connelly</u>, 497 U.S. at 169.  To prove a valid waiver, the government must show that (1) the

28

- 4 -

1   waiver was voluntarily made and not the product of coercion, and (2) that at the time of the

2   waiver the defendant understood both the nature of the right being waived and the consequence

3   of the waiver.  Moran v. Burbine, 475 U.S. 412, 421 (1986).  To find a waiver involuntary,

4   "coercive police activity is a necessary predicate."  Connelly, 497 U.S. at 167.  In determining if

5   the waiver was the voluntary product of a rational and free will, the court must look at the totality

6   of the circumstances.  Id.; United States v. Orso, 266, F.3d 1030, 1039 (9th Cir. 2001).  "A

7   defendant's mental state alone does not make a statement involuntary."  Untied States v. Turner,

8   926 F.2d 883, 888 (9th Cir. 1991) *citing* Connelly, 479 U.S. at 169-171.

9           Cernak's claim that the agents took advantage of his intoxicated or drug-impaired

10  condition, while emotionally distraught and being the subject of a low IQ and psychotic disorder

11  is not substantiated by the evidence. The evidence at the evidentiary hearing, does not

12  demonstrate an impaired condition. Further, there is no evidence that the agents coerced or took

13  advantage of the defendant during the interrogation. The testimony of Dr. Tehrani, eliminates any

14  ability of Cernak to rely upon his low IQ or psychotic disorder as a bar to voluntary waiver of his

15  rights.

16          Voluntariness is determined by looking at a totality of the circumstances, including the

17  details of the interrogation and the characteristics of the suspect. Schneckloth v. Bustamente, 412

18  U.S. 218 (1973). Everything in this case as presented at the evidentiary hearing indicates that

19  Cernak voluntarily, knowingly and intelligently waived his rights under Miranda. Additionally

20  based on a totality of the circumstances, a consent to search his house and automobile were also

21  given voluntarily. Although in custody at the time he gave consent to search, Cernak had been

22  given his Miranda warnings and was also told that he had a right not to consent. No weapons

23  were displayed, no threats were made and he was not told that a search warrant could be obtained

24  if he did not consent. The defendant's Motion to Suppress (#56) should be denied.

25                                    **RECOMMENDATION**

26          Based on the foregoing and good cause appearing therefore,

27          IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that the

28
                                          - 5 -

1  Defendant's Motion to Suppress (#56) be **DENIED**.

2  **NOTICE**

3       Pursuant to Local Rule IB 3-2 any objection to this Report and Recommendation must be in

4  writing and filed with the Clerk of the Court within ten (10) days.  The Supreme Court has held that

5  the courts of appeal may determine that an appeal has been waived due to the failure to file

6  objections within the specified time.  Thomas v. Arn, 474 U.S. 140, 142 (1985).  This circuit has also

7  held that (1) failure to file objections within the specified time and (2) failure to properly address and

8  brief the objectionable issues waives the right to appeal the District Court's order and/or appeal

9  factual issues from the order of the District Court.  Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir.

10  1991); Britt v. Simi Valley United Sch. Dist., 708 F.2d 452, 454 (9th Cir. 1983).

11       DATED this __10th__ day of July, 2006.

12

13

14  _____

15  ROBERT J. JOHNSTON
       United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28